IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
<u>Richmond Division</u>

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No: 3:14-CR-133 |
| | ) | |
| JIMMIE ALAN LANE, | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION FOR DOWNWARD DEPARTURE AND/OR FOR VARIANCE SENTENCE**
**AND POSITION OF DEFENDANT WITH RESPECT TO SENTENCING FACTORS**

COMES NOW the defendant, Jimmie Alan Lane, by counsel, and, pursuant to the

Sentencing Guideline Order, respectfully submits his motions for downward departure and/or

variance sentence and his position with respect to sentencing factors, including those matters set

forth in the presentence report dated January 15, 2015, (hereinafter the "Presentence Report" or

"PSR") and the additional matters set forth herein.   Lane does not object to any material

information, sentencing guideline factors, or policy statements contained in the Presentence

Report.

<u>SUMMARY</u>

Lane stands convicted by his own admission of a tragic and uncharacteristic lapse in

judgment.   During the worst business downturn since the Great Depression, Lane took just under

$135,000 in company funds to pay personal expenses without the authorization of his business

partner.   Such conduct was completely out of character for Lane.   Raised in a middle class family

from North Carolina, Lane has spent his lifetime as a law-abiding citizen and a diligent

businessman who is respected by peers and customers.   He is described by friends, family, and

longtime associates who know him best as a humble, responsible, and generous man, wholly

devoted to his family and larger community.

Lane has fully admitted his crimes, has taken every action that he possibly can to remedy his mistake, and has shown genuine remorse.   Prior to any hint of this criminal proceeding, Lane repaid all of the funds that he depleted from his former business pursuant to a lawful and final civil judgment.   He filed personal bankruptcy, and at an age most people would be thinking about retirement he has a substantial negative net worth.   He is only capable of supporting himself and his family through continued employment.   A period of active incarceration for Lane would destroy that capacity and would not serve the ends of justice.   In light of the characteristics of the defendant and the sentencing goals set forth in 18 U.S.C. § 3553(a), Lane respectfully requests that this Court sentence him to a term of probation that includes a condition or combination of conditions that substitute home detention and community service for imprisonment.

## FACTS

Lane is fifty-nine (59) years old.   PSR ¶ 30.   He comes from a middle class family that moved from Raleigh, North Carolina, to Richmond, Virginia, when Lane was just ten years old. *Id.* ¶¶ 30, 33-34.   He graduated from Lee Davis High School in Mechanicsville in 1973, and then attended North Carolina State University.   *Id.* ¶ 30.   Upon graduation, Lane began a career in

 sales at Virginia Paper Company.   *Id.*   Lane soon met his wife Grace on a blind date and, less than a year later, they were married.   *Id.* ¶ 31.   In this union, Jimmie and Grace have raised two successful and independent daughters.   *Id.*   Many of those who know Lane best have observed his utter devotion to his family (depicted above).   *See, e.g., Letter from Tom Conway*, attached along with nineteen (19) other letters of character collectively as Exhibit 1 ("[w]ith Jimmie family always comes first").

Throughout the following three decades, Lane raised his family while working for several businesses in California, Pennsylvania, Illinois, and Virginia.   PSR ¶ 31.   While he lived in Illinois, Lane was deeply involved in the leadership of the Peoria Board for the Developmentally Disabled and was instrumental in the founding of a local school.   *See Letter from Henry Holling* [in Exhibit 1].   By 2002, Lane had returned to Richmond and joined a direct marketing business called Metis--a relationship which turned out to be the genesis of the instant proceedings.   PSR ¶ 32.   While initially profitable, the company was greatly impacted by the recession of 2008. *Caviness v. Lane (In Re Lane),* 445 B.R. 555, 559 (Bkrtcy. E.D. Va. 2011).   The salaries of the two owners were reduced by over 50% in a single year.   *Id.*   At the time, Lane's two daughters were age 19 and 21, respectively (PSR ¶ 38, noting their current ages), and Lane accepted responsibility for both of their college tuitions (PSR ¶ 49 noting his obligation on their student loans) as well as the other expenses of his household.   By the beginning of 2009, Lane was deeply in debt.   PSR ¶ 6.

Without the authorization of his business partner, Lane had begun taking undisclosed advances from Metis' accounts to pay for his living expenses.   As found by the bankruptcy court:

> Although [Lane] did not have permission to withdraw the funds, he testified that he intended to repay the corporation at some point, and in fact he made some small repayments from his own banking account amounting to $2,090.00.   While debtor siphoned funds for his own use, he also continued to use the same accounts to pay Metis bills and keep the corporation operational.   In addition, and despite bankruptcy's broad definition of malice, there was no evidence to suggest that debtor acted with malice toward Metis as a corporation or towards its ultimate financial security.   While his actions were unwise, thoughtless, and selfish, the evidence does not show that they were malicious.

*In Re Lane,* 445 B.R. at 563-64.

For about four months after the initial discovery of his advances, Lane engaged in

numerous inappropriate and secretive efforts to maintain control over some of the business assets. In September, 2009, however, his partner initiated a dissolution lawsuit for Metis in the Circuit Court of the City of Richmond. *Id.* at 561. On October 27, 2009, Lane resigned his position at Metis. He declared personal bankruptcy just a few weeks later. The trustee for Metis (Lane's former partner) sought a judgment that certain amounts Lane owed were nondischargeable under the Bankruptcy Code. The Bankruptcy Court agreed, although it determined that certain of the trustee's claims and amounts sought could not be sustained, and entered a final judgment after determining that the total amount of Lane's unauthorized withdrawals was $134,377.38. Lane fully satisfied that judgment by March 13, 2013. *See Certificate of Satisfaction*, attached hereto as Exhibit 2.

As noted by Lane's wife Grace:

> The experience was devastating to our family both financially[1] and emotionally. But Jimmie and I worked hard to rebuild our lives, pay the judgment and start to put it all behind us.
>
> More than 5 years later we got a knock on our door. It was a US Marshall [sic] telling us that Jimmie has been indicted by the United States Government on a charge we did not even understand. We were shocked. Judge Gibney, my husband was devastated by the charges. Since the charges were brought Jimmie has come to understand them and has plead [sic] guilty and I can assure you he is humbled, remorseful, embarrassed and sad. I don't think a minute goes by that he is not reflecting on his actions in 2009, wishing he had made different decisions and more than anything fearing the potential consequences to our family.

*Letter from Grace Lane* [included in Exhibit 1].

Lane disclosed the facts about his actions and his guilty plea to his friends and family members. A large number of them have responded by writing letters of character reference to the

---

[1]    As reflected in the Presentence Report, Lane and his wife have been left with a negative joint net worth of ($154,658). PSR ¶ 50.

Court, in which they note that he is deeply remorseful and that the acts are completely out of character for Lane.   Exhibit 1.   Just a few examples of such comments are as follows:

- **Henry Holling-** "Jimmie's reputation for integrity and transparency were highly evident."

- **William Chenault-** high school friend and retired police officer (29 years in law enforcement and welfare fraud).   "As a young man Jimmie was a loyal friend, he displayed a strong work ethic, he was frugal. … I have always found him to be forthright and trustworthy. …   His reputation in our community continues to be one of a man who is respected for his community involvement, loyalty to friends and many other positive attributes that make him a good citizen."

- **Dr. Joseph Banno-** friends with Lane for 23 years.   "Jim's present situation is conflicting with everything I know about his integrity."

- **Douglas Melton-** known Lane for more than 40 years.   "[H]is actions were totally against his normal sound moral and ethical character."

SENTENCING POSITION

I.      Standards of Law

The United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), stands for the proposition that criminal sentencing guidelines are now advisory only and that sentencing courts must "take account of the Guidelines together with other sentencing goals" set forth in 18 U.S.C. § 3553(a).   *Id*. at 224.   Specifically, judges are required "to impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed [educational or vocational] training and medical care."   *Id*. (citing 18 U.S.C. § 3553(a)(2)).   Overall, a sentencing court must impose a sentence that comports with all of these

5

factors and is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).

A sentencing court must follow the three-step process set forth by *Gall v. United States*, 552 U.S. 38 (2007); s*ee also* U.S.S.G. §1B1.1(a)-(c).   First, the court must properly determine the guideline range.   *Id.*; 18 U.S.C. § 3553(a)(4).   Second, the court must determine whether to apply any of the guidelines' departure policy statements to adjust the guideline range.   *Id.*; 18 U.S.C. § 3553(a)(5).   *See also United States v. McBride*, 434 F.3d 470 (6th Cir. 2006) (guideline departures are still a relevant consideration for determining the appropriate guideline sentence). Third, the court must consider all the factors set forth in 18 U.S.C. § 3553(a) as a whole, including whether a variance—a sentence outside the advisory guideline system—is warranted.   *See* §1B1.1(c); *See also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005); *United States v. Stone*, 432 F.3d 651, 655 (6th Cir. 2005); *United States v. Talley,* 431 F.3d 784, 786 (11th Cir. 2005).

Section 3553(a) requires that the Court consider the following seven factors:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed—

   (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B)     to afford adequate deterrence to criminal conduct;
   (C)     to protect the public from further crimes of the defendant; and
   (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established pursuant to the Sentencing Guidelines;

6

(5)     any pertinent policy statement issued by the Sentencing Commission;

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

Each of the factors in these subsections shall be discussed below.

II.     Sentencing Factors

A.     *The Nature and Circumstances of the Offense and the History and Characteristics of Lane [Subsection (a)(1)].*

Lane acknowledges that the nature and circumstances of his offense are serious.   Lane took just under $135,000 in company funds to pay personal expenses without the authorization of his business partner.   He knows that his actions harmed his former business partner.   A mutual friend of the two of them has written to the Court that:

> Ms. Caviness [Lane's former partner] and Mr. Lane have both suffered financial and emotional hardship in this case and my heart aches for each of them.   Ms. Caviness has endured the trauma of the loss of her business and trust in a friend during a fragile time of raising a child as a single parent – her pain cannot be minimized.

*Letter of Earl Hastings* [included in Exhibit 1] at p. 2.

As also reflected in Mr. Hastings' letter and many others, such conduct was completely out of character for Lane.   Raised in a middle class family from North Carolina, Lane has spent his lifetime as a law-abiding citizen and a diligent businessman who is respected by peers and customers.   He is described by friends, family, and longtime associates who know him best as a humble, responsible, and generous man, wholly devoted to his family and larger community.   The only reasonable explanation for his actions is that they were the tragic mistakes of a proud and desperate man.   *See page 3 infra* (describing the serious business and personal financial strains).

Lane has fully admitted his crimes, has taken every action that he possibly can to remedy

his mistake, and has shown genuine remorse.   He has repaid all of the funds that he depleted from his former business, pursuant to a lawful and final civil judgment prior to any hint of this criminal proceeding.   He filed personal bankruptcy, and at an age most people would be thinking about retirement he has substantially no assets.   He is only capable of supporting himself and his family through continued employment.   A period of active incarceration for Lane would destroy that capacity and would not serve the ends of justice.

 B. *A Sentence of Probation Including Home Confinement and Community Service*
   *Fulfills the Needs Set Forth in Section 3553(a)(2) and Better Serves the Interests of*
   *Justice than Imprisonment [Subsections (a)(2) and (3)].*

 Subsection 2 requires, in relevant part, that the Court consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, as well as to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant.   18 U.S.C. § 3553(a)(2).   There is no doubt that the simple fact of the felony conviction will have a serious and long-lasting effect on Lane and his personal and professional standing.   Combined with a six- to twelve-month term of home confinement and some amount of hours of community service, the conviction alone will serve as adequate and specific deterrence.

 Furthermore, the recidivism rate for all first time fraud offenders is just 9.3%, the lowest of any offense category.   *See United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 30 (May 2004), www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/2004 05_Recidivism_Criminal_History.pdf ("Measuring Recidivism").   The extremely low risk of recidivism in this case is also supported by the fact that Lane has no history of substance abuse, no criminal history, and is nearly sixty years of age.   *See id.* at 28–29 (showing markedly lesser

percentages of recidivism for women, and persons with no history of drug or alcohol abuse, and also showing recidivism rate for those over fifty with a criminal history category I to have an especially low recidivism rate of 6.2%); *United States v. Carmona-Rodriguez*, 2005 WL 840464, at *5 (S.D.N.Y. 2005) (observing that those defendants "over the age of 40 … exhibit markedly lower rates of recidivism in comparison to younger defendants"); *see also United States v. Hamilton*, 323 F. App'x 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines").

   C.     *The Relevant Sentencing Guideline Calculation and Policy Statements.*

   There is no dispute regarding the guidelines calculation in this case.   The PSR computes the guideline offense level under U.S.S.G. § 2K2.1 to be 16, with a two-point enhancement under § 3B1.3 and a three-point credit for Lane's timely acceptance of responsibility.   Lane has no criminal history whatsoever.   With a criminal history category of I, the PSR calculates a guidelines sentencing range of 18 to 24 months.   To the best of Lane's knowledge and belief, there are no relevant Guideline policy statements that are not reflected in the PSR.

   E.     *A Sentence of Probation Would Reflect Sentences Received by Similarly-Situated Defendants.*

   To determine the sentencing norms for similarly situated defendants, counsel has used PACER to analyze cases involving other persons with no prior convictions who plead guilty to a single count of violating 18 U.S.C. § 2314 since 2007.[2]   In the Eastern District of Virginia, only

---

   [2]     *Booker* was issued by the U.S. Supreme Court in 2005.   However, prior to 2007 documents sufficient to ascertain information regarding the subject offense and criminal history are not available in PACER.

two such individuals were identified but the facts of those cases are not comparable to Lane.[3]

In the Western District of Virginia, there were no cases of individuals pleading guilty to the same

charge with the same criminal history category since 2007.

The District of Columbia provides a larger sample of similarly-situated defendants.   In

that district, nine (9) persons have plead guilty of the same charge since 2007 who have criminal

history and loss amounts comparable to Lane (less than $200,000):

| Defendant | Amount Stolen | Sentence |
| --- | --- | --- |
| Louisa Roussey [1:08-CR-00073] | $61,000.00 | 5 years of probation (home confinement on Fridays) |
| Bruce Sanders [1:09-CR-00101] | $140,079.16 | 3 years of probation |
| Douglas Francis [1:09-CR-00154] | $18,471.00 | 2 years of probation |
| Deborah Bartlett [1:09-CR-00154] | $18,471.00 | 3 years of probation |
| Michael Tibbs (victim is a church) [1:10-cr-00011] | $107,445.53 | 1 year of incarceration |
| Frankie Kennedy (victim is a nonprofit organization helping indigent transplant patients) [1:10-CR-00257] | $86,286.51 | 5 months of incarceration |
| Yesenia Amaya (victim is D.C. government body) [1:11-cr-00108] | $31,211.27 | 3 months of incarceration |
| Frankie Glascoe [1:12-CR-00191] | $52,246.73 | 5 years of probation |

---

[3].       While on bond after illegally entering the country, Valencia [1:14-CR-00019] conspired to commit at least 23 residential burglaries in numerous states, resulting in the loss of approximately $559,481 worth of property that included precious family heirlooms that were never recovered.   Valencia received a twenty-four (24) month sentence.   In the second case, the defendant [Mazariegos-Perez, 2:08cr86-001] was the subject of an upward departure motion by the Government and received a thirty (30) month sentence.   Mazariegos-Perez had a history of traffic and assault convictions that had been excluded from his guidelines calculation, and had engaged in a long-running scheme to sell fraudulent vehicle titles, registrations, and associated license plates to undocumented workers.   *But see U.S. v. Philip Monforte*, 3:11cr160, in which a defendant with no criminal history plead guilty to two crimes (including a § 2314 violation) and received a below-guideline sentence of 18 months probation to include six (6) months of home detention.

| Defendant | Amount Stolen | Sentence |
|---|---|---|
| | | |
| Thomas Webb [1:14-CR-00087] | $45,419.19 | 3 years of probation |
| Tabitha Harley Williams (victim is a nonprofit) [1:14-CR-00091] | $144,113.43 | 30 days of incarceration |

As demonstrated above, well over half (60%) of the similarly situated individuals in the

District of Columbia were sentenced to probation.   All of the individuals who were incarcerated

for any period victimized nonprofit organizations, churches, or public bodies, among other

aggravating factors not present in this case.[4]   None of these individuals had already satisfied

restitution obligations prior to the initiation of any criminal charges, as Lane had.

F.      *Restitution Has Been Fully Paid.*

As noted above and agreed in the parties' Plea Agreement, appropriate restitution in this

case has already been satisfied.   PSR ¶¶ 10, 58.   Lane is aware that his former business partner

has written the Court to request additional compensation, consisting of an additional $126,619.06

in alleged transaction amounts that were already litigated and discharged in the bankruptcy case

and over $90,000 in legal fees that Metis incurred in that litigation.   Without in any way

minimizing the harm that Lane caused, neither Lane nor the Government maintain that such

additional amounts are properly included in restitution.

<u>CONCLUSION</u>

Lane has fully admitted his crimes, has taken every action that he possibly can to remedy

his mistake, and has shown genuine remorse.   He is only capable of supporting himself and his

family through continued employment.   A period of active incarceration for Lane would destroy

---

[4]      See, e.g., *Amaya, supra,* Docket No. 19 (defendant stole checks beginning just four and a half months after having been arrested for another theft offense and repeatedly failed to fulfill her responsibilities in her criminal cases as well as her financial obligations).

that capacity and would not serve the ends of justice.   In light of the characteristics of the

defendant and the sentencing goals set forth in 18 U.S.C. § 3553(a), Lane respectfully requests that

this Court sentence him to a term of probation that includes a condition or combination of

conditions that substitute home detention and community service for imprisonment.

Respectfully Submitted,

JIMMIE ALAN LANE

By_____/s/_____

Patrick Hanes (VSB No. 38148)
Daniel P. Watkins (VSB No. 84592)
WILLIAMS MULLEN
P. O. Box 1320 (23218-1320)
200 South 10th St., Suite 1600
Richmond, VA 23219
Telephone: 804.420.6000
Facsimile: 804.420.6507
Email: phanes@williamsmullen.com
Email: dwatkins@williamsmullen.com

Certificate of Service

I hereby certify that on the 5th day of February, 2015, I will electronically file the foregoing with the Clerk of Court using the CM/ECT system which will then send a notification of such filing (NEF) to the following:

David Thomas Maguire
Assistant United States Attorney
Main Street Center
600 East Main Street
18th Floor
Richmond, Virginia 23219

_____/s/_____

13